COMMONWEALTH *vs.* HAROLD E. RANSOM.

Suffolk.   December 7, 1970. — January 28, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, REARDON, & QUIRICO, JJ.

*Practice, Criminal,* Appeal; Capital case; Assistance of counsel; Exceptions: failure to save exception.  *Homicide.*

Upon review of a capital case under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, in which the defendant was convicted of murder in the second degree of one a stranger to him prior to an altercation resulting in the victim's death from multiple stab wounds, this court ordered entry of a verdict of guilty of manslaughter as being more consonant with justice where it appeared from all the testimony that the altercation was precipitated when the victim or his friend called off a bet at a game of dice and picked up some of the defendant's money, that it was doubtful who was the aggressor in the ensuing fight, and that alcohol probably played a part in so far as the victim was concerned and drugs may have played a part in respect to the defendant. [583]

There was no abuse of discretion at the commencement of the second day of trial of a murder case in the judge's denial of the defendant's request for the discharge of his counsel, for whose appointment some eight months before the trial the defendant had petitioned, and for the appointment of new counsel, where it appeared that the defendant's objections were concerned with his counsel's choice of trial tactics. [585]

Failure of the defendant in a capital case to save exceptions to alleged improper statements by the prosecutor in his opening and to certain evidence at the trial would have warranted this court in refusing to review such matters upon the defendant's appeal under G. L. c. 278, §§ 33A–33G, and were of such slight significance as not to require action under § 33E, as amended through St. 1962, c. 453. [586]

INDICTMENT found and returned in the Superior Court on September 11, 1968.

The case was tried before *Fairhurst,* J.

*Reuben Goodman* for the defendant.

*John T. Gaffney,* Assistant District Attorney (*James M. McDonough,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

TAURO, C.J. The defendant was convicted of murder in the second degree on an indictment which charged him with the murder of Theodore Williams on June 1, 1968. The case is here on the defendant's appeal under G. L. c. 278, §§ 33A–33G.

We summarize the pertinent evidence: On June 1, 1968, as a result of information received, Boston police found the body of the decedent, Theodore Williams, lying on its back. The body was removed and a search was made for a missing shoe and a possible weapon, but neither was found. The death certificate stated the cause of death to be multiple stab wounds. The medical examiner listed approximately twenty-three injuries, characterizing some as "cuts," some as "scrapes or abrasions" and "stabs." The actual cause of death was massive bleeding into the right chest from stab wounds. The decedent had been drinking heavily. He was stabbed in the front and back. Several of the wounds had a downward direction indicating that the decedent was standing or sitting, rather than lying down, when he received them. In spite of the injuries, the decedent could have used his right arm and walked for a considerable period of time.

Witnesses for both the prosecution and the defence testified that on the evening of June 1, 1968, the defendant was at a dice game and made a bet. When the bet was called off there was an argument about the amount of money returned to the defendant. One Richard A. Christmas testified that on June 10, 1968, the defendant, whom he had known for about a year, asked him for methadone pills. At that time the defendant told him that when the argument started a person on the defendant's right stabbed the defendant in the forearm. The defendant ran into an alley and crawled under an automobile to get away from the person who had stabbed him. A friend threw the defendant a knife or other weapon and a scuffle ensued. The defendant finally got on top of his assailant and stabbed him approximately seven to ten times.

One L. C. Williams testified that it was Theodore Williams

who called off the bet. The defendant claimed that some of his money was not returned, and hit Theodore Williams who ran away. The defendant chased him. On cross-examination he testified that the victim was a close friend of his.

The defendant called six witnesses and testified on his own behalf. One of these witnesses, James Holliday, the brother of the defendant, testified that L. C. Williams picked up the money. Theodore Williams said, "I wouldn't give him none back." The defendant became angry and took off his jacket. The witness saw Theodore Williams chasing the defendant. He looked for the defendant and then went to his girl friend's house where he found the defendant with a deep gash on his left arm and another gash on his right arm. They then went to the hospital.

One James Womack testified that on the evening of June 1, 1968, he was in the vicinity of the incident and saw the defendant running and another person running about ten feet behind.

The defendant testified that L. C. Williams picked up the money that had been bet. When he saw that L. C. Williams was not going to return the money, he took off his coat and said, "You don't give me back my money, I will kill you." He had no weapon of any kind and intended to "whip" L. C. Williams. Up to that point he had never spoken to Theodore Williams. When he saw a knife in Theodore Williams's hand, he turned around and grabbed it. Theodore Williams stabbed him in the arm and the defendant ran. When he fell, Theodore Williams caught him and stabbed at his head but missed and cut his nose. The defendant ran into an alley and up to a fence where he could run no farther. Theodore Williams was still pursuing him. He picked up something resembling a spike and kept swinging at Williams. He did not know how many times he struck the decedent, but he never struck the decedent after Williams fell to the ground. After knocking Williams down, he ran away. The defendant's wounds on the forearm, back, leg and nose were treated at the hospital. The

defendant further testified that he did not know Theodore Williams's name at the time of the incident. The prosecution introduced ten records of convictions of the defendant including a record of narcotics violations.

1. The defendant urges this court to grant a new trial or in the alternative to reduce the verdict from murder in the second degree to manslaughter. General Laws c. 278, § 33E, as amended through St. 1962, c. 453, provides in part, "In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence . . . or for *any other reason that justice may require* (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence" (emphasis supplied). In construing § 33E, we have said, "[T]he statute . . . consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice." *Commonwealth* v. *Baker*, 346 Mass. 107, 109.

The defendant and the decedent were strangers to each other prior to the trouble which resulted in the killing. The altercation was precipitated when the decedent or his friend called off a bet at a game of dice and picked up some of the defendant's money. There is much conflict in the evidence as to who was the aggressor in the ensuing fight. Alcohol probably played a part in so far as the decedent was concerned and drugs may have played a part in respect to the defendant. In any event, the death resulted from a senseless brawl. From all the testimony we conclude that a verdict of manslaughter would have been more consonant with justice. It is our belief that the defendant acted in the heat of a sudden affray, and that the killing was done in the heat of passion, as a result of uncontrolled anger and violent action on the part of both the defendant and the decedent.

2. This disposition of the case upon its peculiar facts under § 33E makes unnecessary prolonged discussion of assignments of error concerning whether the charge adequately permitted the jury to find the defendant guilty only of manslaughter. Considering the charge as a whole (*Commonwealth* v. *Pinnick*, 354 Mass. 13, 15), including the supplementary charge and the judge's answers to questions asked by the jury, it fully and fairly stated the basic difference between murder and manslaughter.

3. The defendant contends that differences between him and his counsel at the trial impaired counsel's effective functioning and violated the defendant's constitutional right to counsel. Before commencement of the second day of the presentation of evidence, it was brought to the attention of the court that the defendant was dissatisfied with his court-appointed counsel and that he had requested a change.[1] The defendant gave the following reasons, among others, for his request: (1) His counsel had not brought out from the medical examiner that the victim's wounds could have been caused by a spike or weapon other than a knife. (2) His counsel advised him to say that he had a knife. (3) His counsel had advised him to plead to a manslaughter charge. (4) Contrary to the defendant's wishes, his counsel did not want the pictures of the victim's body introduced in evidence. (5) His counsel did not bring in several witnesses requested by the defendant.[2] Counsel for the defendant informed the court that "I have told him [the defendant] that I will abide by his instructions," but also stated that in the circumstances "it will make it exceedingly difficult for me to continue to adequately represent him for the duration of the trial."

The applicable rule was stated in *Lamoureux* v. *Common-*

---

[1] The defendant himself petitioned for the appointment of Henry E. Quarles as counsel. The petition was allowed on September 25, 1968, over eight months before trial began.

[2] The defendant's counsel (Mr. Quarles) stated for the record that all persons whose names and addresses were furnished to him by the defendant were summoned as witnesses. Also the prosecutor offered to summon any witnesses requested by the defendant.

*wealth,* 353 Mass. 556, 560. "Once the trial had begun, the effectiveness of any right of the defendant to force a change of counsel was diminished. *United States* v. *Denno,* 348 F. 2d 12, 15–16 (2d Cir.). See *United States* v. *Cozzi,* 354 F. 2d 637, 639 (7th Cir.). Thereafter any prejudice to his interests was to be balanced with the foreseeable effect upon the trial already in progress. Upon this issue the decision must be largely within the discretion of the trial judge." The trial judge did not abuse his discretion in not declaring a mistrial. The defendant's objections were concerned with his attorney's choice of trial tactics. In the present case, as in the *Lamoureux* case, "the results of a change in attorneys would have involved the dismissal of the lawyer who had been assigned to the case for more than . . . [eight] months, the discharge of the jury, the finding and appointment of new counsel, and the lapse of sufficient time to enable, if possible, preparation of the case to the petitioner's satisfaction." *Lamoureux* v. *Commonwealth, supra,* at 560. The trial judge fully considered the defendant's reasons for the desired change in counsel.

4. The defendant contends that it was improper for the prosecuting attorney (a) to say in his opening statement and later to elicit testimony that the defendant had a narcotics habit and attempted illegally to procure methadone and (b) to suggest to the jury by his questioning of witnesses that the defendant was prone to fighting. In his opening the prosecutor asserted that the Commonwealth would show that the defendant at some time met with a witness, Richard Christmas, in order to get methadone which, the jury were told, is used in breaking a narcotics habit. He also stated that the evidence would show that the defendant later got a fix of heroin. Christmas testified that the defendant had asked Christmas for methadone pills so he could break his drug habit; and during the course of the conversation, the defendant told Christmas about his argument and the stabbing of the decedent. Christmas was also asked, "And are you familiar with this — with the defendant's reputation as far as being an individual who gets

Commonwealth *v.* Ransom.

involved in fights and so forth?" The defendant objected
to the question and the court excluded it "in that form."
The prosecutor also called Officer William Curry as a witness
and established that Curry knew the defendant for three or
four years while Curry was attached to the Boston Police
Vice and Narcotics Unit. James Holliday, the defendant's
brother, was asked by the prosecutor on cross-examination,
"You have seen your brother in other fights, haven't you?"
The witness answered, "No, sir." The prosecutor also
asked, "You say after he [the defendant] took off his jacket
and threw it down, and he was very mad, that you recog-
nized this condition in him, that he just stood there?" The
witness answered, "Yes, sir." The prosecutor in cross-
examination of the defendant elicited from him that he had
bought heroin on the day he talked to Christmas. On re-
direct examination the defendant testified that he had used
heroin for three or four years.

No exception was saved to the opening statement, to the
evidence concerning narcotics, and to statements about the
defendant's reputation for fighting. The failure to take ex-
ception is sufficient ground for refusing to review these
matters. *Commonwealth* v. *Scott,* 355 Mass. 471, 476. Al-
though we may consider these matters in performing
our duty under c. 278, § 33E (*Commonwealth* v. *Johnson,*
352 Mass. 311, 316), they have too slight significance to lead
to any action (beyond that taken for other reasons in part 1
of this opinion) under § 33E.[3] Other questions complained
of were not prejudicial. Officer Curry's testimony that he
had been in the Vice and Narcotics Unit for several years
and knew the defendant during that time does not constitute
prejudicial error. It was too obscure to be harmful. *Com-
monwealth* v. *Vanetzian,* 350 Mass. 491, 495. Questions con-

---

[3] Despite the principles discussed in *Commonwealth* v. *Stone,* 321 Mass.
471, 473, *Commonwealth* v. *Valcourt,* 333 Mass. 706, 717–718, and *Common-
wealth* v. *Cutler,* 356 Mass. 245, 258, the evidence concerning which the de-
fendant assigns error (a) had relevance in explaining the circumstances of the
meeting between the defendant and the witness Christmas and (b) was some-
what cumulative of admissions by the defendant on redirect examination. Its
tendency to show the commission of other offences was at most incidental.
See *Commonwealth* v. *Douglas,* 354 Mass. 212, 225–226.

cerning the defendant's pugnacity were answered in the negative, were vague, or were of too trivial effect to be prejudicial. See *Commonwealth* v. *Mele, ante,* 225, 230.

5. The case is remanded to the Superior Court for the entry of a verdict of guilty of manslaughter and for imposition of sentence.

*So ordered.*